NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>Plaintiff,<br><br>v.<br><br>BECTON, DICKINSON, AND COMPANY,<br><br>Defendant. | Civil Action No.: 17-691 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Plaintiff National Union Fire Insurance Company of Pittsburgh, PA's Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 17). Defendant has opposed Plaintiff's Motion (ECF No. 24), to which Plaintiff has replied. (ECF No. 27).[1] The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies Plaintiff's Motion for Judgment on the Pleadings.



---

[1] The Court further notes that the Defendant has submitted an unauthorized sur-reply in contravention of L. Civ. R. 7.1(d)(6). (ECF No. 28). Furthermore, Plaintiff and Defendant have each sent additional letters regarding the propriety and content contained in Defendant's unauthorized sur-reply. (ECF Nos. 29-30). Defendant's unauthorized sur-reply discusses two additional and newly cited cases by Plaintiff in its reply brief. (ECF No. 28). The Court has reviewed same, and will address the merits contained in all of these later submissions as it deems necessary.

# I. BACKGROUND[2]

Plaintiff is an insurance company and a duly formed corporation under the laws of Pennsylvania, that has its principal place of business in New York, NY. (ECF No. 1 ("Compl.") ¶ 10). Defendant is a duly formed corporation under New Jersey law and maintains a principal place of business in Franklin Lakes, NJ. (Id. ¶ 11).

There are three relevant sets of insurance policies in this case, which all contain relatively the same language. (Id. ¶¶ 27-63). The first set of policies concluded in 1993, the second set in 1994 and 1997, and the last policy ended in 1999. (Id.). Each set of policies contains, *inter alia*, language that explains the coverage purchased by Defendant from Plaintiff. (Id.). For example, the 1993 policies explain that those policies only applied to "that portion of the ultimate net loss in excess of the retained limit which [Defendant] shall become legally obligated to pay as damages for liability imposed upon [Defendant] by law, or liability assumed by [Defendant] under contract because of (i) **personal injury**, (ii) **property damage**, or (iii) **advertising liability**." (Id. ¶ 28) (emphasis in original) (internal quotations omitted). These enumerated items are collectively defined by the policies as an "occurrence." (Id.). The 1993 policies further provide that Defendant was required to provide Plaintiff with notice of an occurrence as soon as Defendant itself became aware of same. (Id. ¶ 31). The 1993 policies also contain some exclusionary provisions that barred coverage for certain types of torts and injuries. (Id. ¶ 32). Coverage under these policies ran from October 1, 1985 through April 1, 1993. (Id. ¶ 33).

By comparison, the 1994 and 1997 policies contain similar language. For example, coverage under the 1994 and 1997 policies applies

---

[2] This background is derived from Plaintiff's Complaint, which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

2

only to 'those sums in excess of the Retained Limit that [Defendant] becomes legally obligated to pay by reason of liability imposed by law or assumed by [Defendant] under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury**, or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world.'

(Id. ¶ 34) (emphasis in original). The 1994 and 1997 policies go on to define these aforementioned terms, and contain notice requirements that are nearly identical to the 1993 policies. (Id. ¶¶ 35-44). The 1997 policies provided coverage from October 1, 1987 through October 1, 1997. (Id. ¶ 45). Plaintiff does not include any allegations as to the coverage period under the 1994 policies. Finally, while the operative language of the 1999 policy may be slightly different, the sum and substance of the policy is the same as the 1993, 1994, and 1997 policies. (Id. ¶¶ 46-63). That is, the 1999 policy covered Defendant's damages stemming from bodily injury, personal injury, property damage, and/or advertising damage. (Id. ¶ 49). The 1999 policy also contains similar exclusionary and notice provisions. (Id. ¶¶ 50-63).

On January 30, 2017, Plaintiff brought this declaratory judgment action seeking

a declaration that it is not obligated to defendant or indemnify [Defendant] in connection with the consolidated lawsuits captioned In Re Hypodermic Products Direct Purchaser Antitrust Litigation ... and Jabo's Pharmacy, Inc., et al. v. Becton Dickinson & Company; ... MedStar Health, Inc., et al v. Becton Dickinson & Company; ... The Hebrew Home for the Aged at Riverdale v. Becton Dickinson and Company.

(Id. ¶¶ 1-2) (emphasis in original).[3] "The Underlying Actions were instituted against [Defendant] between 2005 and 2007 and settled for a combined $67 million in 2009 and 2013." (Id. ¶ 3).

---

[3] The Court shall collectively refer to these actions as the "Underlying Actions." Additionally, the Court shall refer to *In Re Hypodermic Products Direct Purchaser Antitrust Litigation* as the "Direct Purchaser Action," and to the remaining Underlying Actions as the "Indirect Purchaser Actions."

The Direct Purchaser Action was brought in 2005. Plaintiffs therein asserted that they were "all persons or entities who purchased relevant hypodermic products, disposable syringes and associated needles of the safety and/or non-safety varieties directly from" Defendant. (Id. ¶ 14). According to those plaintiffs, Defendant "illegally acquired and maintained a monopoly of Hypodermic Products and markets for those products" which allowed Defendant to overcharge for said products. (Id. ¶ 16). Defendant allegedly accomplished this monopoly by imposing market share purchase requirements, "bundling its goods for exclusionary purposes," entered into exclusionary contracts with "group purchasing organizations," and "conspired with other established manufacturers to impose rebate penalties on purchasers relating to a bundle of products." (Id. ¶ 17). Accordingly, the Direct Purchaser Action was brought to recover damages stemming from Defendant's alleged antitrust conduct, pursuant to Sections 1 and 2 of the Sherman Act. (Id. ¶ 18). The Indirect Purchaser Actions asserted substantially similar allegations with the exception of the fact that the plaintiffs therein did not allege that the purchases were made directly from Defendant, but rather from some other source. (Id. ¶¶ 19-24). The Direct Purchase Action settled in 2009 for $45 million, while the Indirect Purchase Actions settled for $22 million in 2013. (Id. ¶¶ 25-26).

According to Plaintiff, Defendant waited until 2014 to give Plaintiff the following notices: 1) the institution of the Underlying Actions; 2) settlement of the Underlying Actions; and 3) request for reimbursement for Defendant's defense and settlement costs stemming from the Underlying Actions. (Id. ¶¶ 4-6; 64-70). Plaintiff further alleges that Defendant's request for reimbursement must be denied because: 1) the Underlying Actions are not covered under the policies because they did not stem from "personal injury" or "advertising liability" as defined by

4

the policies; 2) the coverage may be excluded under the policy's exclusionary provisions; and 3) since the Underlying Actions were settled, no court has determined Defendant's liability and Plaintiff did not consent to settlement.[4] (Id. ¶¶ 7, 73, 76-78).

Furthermore, Plaintiff alleges that the request for reimbursement must be denied as Defendant allegedly did not comply with the policies' conditions precedent. (Id. ¶¶ 8, 73). Specifically, Plaintiff alleges that Defendant did not give timely notice of the Underlying Actions, failed to cooperate with Plaintiff, and made voluntary payments without consulting with Plaintiff. (Id. ¶¶ 8, 73). Hence, Plaintiff instituted this action as it believes "Declaratory Judgment is appropriate in this matter because [Defendant] seeks insurance coverage from [Plaintiff] with respect to the Underlying Actions, and [Plaintiff] *disputes* its obligations to provide coverage." (Id. ¶ 9 (emphasis added); *see also* ¶¶ 74, 78).

Against this background, Plaintiff brings this action seeking the following relief: 1) Declaratory Judgment that Plaintiff Has No Duty to Defend or Indemnify Defendant under the Policies for the Underlying Actions; and 2) Declaratory Judgment that Defendant has No Coverage for the Underlying Actions under the Policies. (Id. at 15-19). On April 4, 2017, Defendant Answered Plaintiff's Complaint and also asserted Counterclaims against Plaintiff, seeking: 1) Declaratory Judgment that Plaintiff Must Pay Defendant's Defense and Indemnity Costs Arising from the Underlying Actions; 2) Compensatory and Consequential Damages Stemming from Plaintiff's Alleged Breach of the Policies; and 3) Compensatory and Consequential Damages Stemming from Plaintiff's Breach of the Duty of Good Faith and Fair Dealing. (ECF No. 4). Thereafter, Plaintiff filed the subject Motion for Judgment on the Pleadings, seeking a Court Order

---

[4] The Court notes that, in support of its motion, Plaintiff only relies on the first of these three enumerated reasons for declaratory judgment, despite alleging two additional bases in the Complaint.

entering judgment in its favor on the declaratory judgment counts, and dismissing Defendant's Counterclaims. (ECF No. 17).

## II. LEGAL STANDARD

Pursuant to Rule 12(c), the movant for judgment on the pleadings must establish: 1) that no material issue of fact remains to be resolved; and 2) the entitlement to judgment as a matter of law. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See Rosenau*, 539 F.3d at 221. Hence, a motion made pursuant to Rule 12(c) should not be granted *"unless the moving party has established that there is no material issue of fact to resolve*, and that it is entitled to judgment as a matter of law." *Perez v. Griffin*, 304 F. App'x 72, 74 (3d Cir. 2008) (citing *Mele v. FRB*, 359 F.3d 251, 253 (3d Cir. 2004)) (emphasis added). In resolving such motions, that Court may also consider: 1) items attached to the complaint; 2) those matters referenced in the complaint; 3) matters of public record; and 4) matters integral to or upon which a plaintiff's claim is based. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. ANALYSIS

The Court finds that Plaintiff is not entitled to judgment on the pleadings. When a district court has diversity jurisdiction over a matter, it must apply the substantive law of the forum. *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993); *see also Robertson v. Cent. Jersey Bank & Trust Co.*, 47 F.3d 1268, 1273 (3d Cir. 1995) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). This Court has diversity jurisdiction over Plaintiff's claims. As such, it must apply New

Jersey law to this action. Indeed, both Plaintiff and Defendant concede this point as both entities rely on New Jersey law in their briefs. (ECF No. 17-1 ("Pl. Mov. Br.") at 9; ECF No. 24 ("Def. Opp. Br.") at 11-12).

In New Jersey, insurance policies are viewed as contracts and, when the terms are clear, "courts should give the policy's words 'their plain, ordinary meaning." *President v. Jenkins*, 180 N.J. 550, 562 (N.J. Sup. Ct. 2004) (quoting *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 595 (N.J. Sup. Ct. 2001) (additional citations omitted). "[T]he duty [of an insurer] to defend [its insured] comes into being when the complaint states a claim constituting a risk insured against." *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 173 (N.J. Sup. Ct. 1992) (quoting *Danek v. Hommer*, 28 N.J. Super. 68, 77 (N.J. Super. Ct. App. Div. 1953), *aff'd o.b.*, 15 N.J. 573 (N.J. Sup. Ct. 1954)). Hence, whether an insurer must defend its insured depends on the allegations contained in the complaint against the insured.

Here, the Court finds that, at this juncture, it is not clear from the language of the policies whether or not the Underlying Actions fall within the parameters of said policies. Indeed, the language of the policies is not as clear as Plaintiff argues. As discussed above, the policies covered Defendant for sums due to plaintiffs in actions brought against Defendant, which stem from personal injury and/or advertising injury.[5] (Compl. ¶¶ 28, 34, 59). As Plaintiff concedes, the personal injury coverage under the policies applies to

> injury, other than 'bodily injury,' arising out of one or more of the following offenses: ... Oral or written publication of material that slanders or libels a person or organization or disparages a persons' or organization's goods, products, or services; or [] Oral or written publication of material that violates a person's right of privacy.

---

[5] The policies also covered Defendant for bodily harm and/or property damage. However, it is undisputed that the Underlying Actions did not allege such damages and therefore are not relevant to the analysis herein. (Pl. Mov. Br. at 10 n. 2).

7

(Pl. Mov. Br. at 11 n. 3) (citations omitted) (brackets in original). Advertising liability provides coverage for:

> (a) unintentional Libel, Slander, or Defamation of Character; (b) infringement of copyright or title or of slogan; (c) piracy or *unfair competition* or idea misappropriation under an implied contract; (d) Invasion of rights to privacy, committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast out of [Defendant's] advertising activities.

(Id. at n. 4) (emphasis added) (internal quotations omitted).

As noted, the Underlying Actions brought against Defendant all relate to Defendant's alleged anti-competitive conduct; a fact that Plaintiff concedes in its moving brief. (Compl. ¶¶ 13-24; Pl. Mov. Br. at 10). Those claims were asserted under Sections 1 and 2 of the Sherman Act. Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1. The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that *produced anti-competitive effects* within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997) (emphasis added). Section 2 prohibits the monopolization of "any part of the trade or commerce among the several States." 15 U.S.C. § 2. Hence, it seems apparent that the plaintiffs in the Underlying Actions brought against Defendant, at least in part, alleged Defendant was engaged in unfair competition. However, a review of the policies does not reveal any definition of the term "unfair competition," and courts have interpreted this term broadly. *See Vickers, Inc. v. Seaboard Sur. Co.*, 1996 U.S. Dist. LEXIS 19689 (D.N.J. Feb. 5, 1996), *aff'd*, 107 F.3d 9 (3d Cir. 1997).

Accordingly, when reviewing Plaintiff's Complaint in a light most favorable to Defendant, the Court finds that a genuine issue of fact exists with regards to the meaning of the term "unfair competition." As a matter of fact, Plaintiff itself alleges that coverage under the policies is "disputed." (Compl. ¶ 9). Because the term "unfair competition" is unclear, whether or not Defendant enjoys coverage under the policy also remains unclear. While Plaintiff attempts to provide a definition for the term "unfair competition" in its briefs, and while that definition may ultimately be true, the Court cannot rule that, as a matter of law, Defendant does not enjoy coverage under the policies in connection with the Underlying Actions. The only way to ascertain the meaning of this term would be through meaningful discovery. *See Nestle Foods Corp v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 105 (D.N.J. 1990) (finding that the "drafting history is relevant to the interpretation of policy language, and ... permits the meaning of a contract to be determined from the parties intent.") (citation omitted). Therefore, the Court is not persuaded that Plaintiff is entitled to judgment on the pleading based upon the language in the policies.

The Court is also not persuaded by Plaintiff's argument that Defendant's Counterclaims must be dismissed. Plaintiff's first argument in support of dismissing Defendant's declaratory

judgment counterclaim is because Defendant "cannot meet its burden to establish entitlement to coverage for the Underlying Actions under the [p]olicies ... Defendant's counterclaims for declaratory relief must be dismissed." (Pl. Mov. Br. at 15). However, this argument does not prevail since, as discussed above, Plaintiff cannot establish, at this juncture, that Defendant is not entitled to coverage for the Underlying Actions. Accordingly, the Court will not dismiss Defendant's Counterclaims for declaratory judgment.

Similarly, the Court will not dismiss Defendant's Counterclaim for bad faith. The Court declines to dismiss the bad faith Counterclaim because a "determination of whether an insurance company has acted in bad faith requires, *as a predicate, a determination that coverage exists for the loss claimed by the insured.*" *Hudson Universal v. Aetna Ins. Co.*, 987 F. Supp. 337, 342 n. 3 (D.N.J. 1997); *see also G-I Holdings v. Hartford Fire Ins. Co.*, 2007 U.S. Dist. LEXIS 19069 (D.N.J. Mar. 16, 2007). Here, no determination of coverage can be rendered at this juncture. Accordingly, Defendant may continue to maintain its bad faith Counterclaim, and the Court will not dismiss same.

### IV. CONCLUSION

For the aforementioned reasons, Plaintiff's Motion for Judgment on the Pleadings (ECF No. 17) is hereby denied. An appropriate Order accompanies this Opinion.

DATED: February 20, 2018

JOSE L. LINARES
Chief Judge, United States District Court